IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: Appeal of: Alyssa Schell and : 
Olde Richmond Civic Association :
:
From a Decision of: Zoning Board :
of Adjustment :
:
Appeal of: Alyssa Schell and : No. 1249 C.D. 2023
Olde Richmond Civic Association : Argued: February 3, 2026


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
          HONORABLE CHRISTINE FIZZANO CANNON, Judge
          HONORABLE STELLA M. TSAI, Judge

OPINION
BY JUDGE FIZZANO CANNON                    FILED: March 19, 2026


Alyssa Schell (Schell) and Olde Richmond Civic Association (Association) (collectively, Objectors) appeal from the October 4, 2023 order of the Court of Common Pleas of Philadelphia County (Trial Court). The Trial Court's order affirmed the decision of the Zoning Board of Adjustment of the City of Philadelphia (Board)[1] granting use and dimensional variances to Olde Richmond Ventures, LLC, which is owned by Carlos Masip (collectively, Applicant). In addition to requesting consolidation of three contiguous lots on Tulip Street in Philadelphia into one lot, Applicant requested several variances including a use variance to construct a multi-family triplex dwelling on the consolidated lot and related dimensional variances. For the reasons that follow, we reverse the Trial Court's order.

---

[1] Because the Board failed to file a brief as directed by order dated September 17, 2024, this Court precluded the Board from filing a brief or participating in oral argument of this matter. *See* Commonwealth Court Order dated September 17, 2024.

## I. Background and Procedural Posture

The property at issue consists of three zoning lots[2] at 2409R, 2411R, and 2413-15R Tulip Street in Philadelphia (collectively, the Property), all located within Philadelphia's RSA-5 zoning district (District), which is zoned for single-family use. *See* Trial Court 1925(a) Opinion filed March 4, 2024 (Trial Court Opinion) at 2, Reproduced Record (R.R.) at 241; Findings of Fact and Conclusions of Law of the Philadelphia Zoning Board of Adjustment (Board Decision) at 1, R.R. at 126. Lots 2409R Tulip Street and 2411R Tulip Street measure 311 square feet and 561 square feet,[3] respectively, and are landlocked, meaning that they are located behind other lots and are not directly accessible from any street. *See* Trial Court Opinion at 2, R.R. at 241. Lot 2413-15R measures 1,143 square feet and has 36 feet of street frontage.[4] *See* Trial Court Opinion at 2, R.R. at 241. Applicant owns all three lots. *See* Board Decision at 3, R.R. at 128.

Applicant filed an application with the Philadelphia Department of Licenses and Inspections (L&I) seeking, first, to consolidate the three lots into one lot and, second, to erect thereon a triplex with three dwelling units for multi-family household living, which structure would in turn require a use variance and three dimensional variances (Application). *See* Board Decision at 1, R.R. at 126; *see also*

---

[2] Although designated as three zoning lots, the Property actually consists of four tax parcels. *See* Findings of Fact and Conclusions of Law of the Philadelphia Zoning Board of Adjustment (Board Decision) at 1, Reproduced Record (R.R.) at 126.

[3] The minimum lot area in the District is 960 square feet. Zoning Code, Table 14-701-1.

[4] Despite its Tulip Street address, Lot 2413-15R's street frontage is on Boston Street, which intersects perpendicularly with Tulip Street. *See* Trial Court Opinion at 2, R.R. at 241.

2

Notice of Refusal dated June 13, 2022 (Notice of Refusal),[5] R.R. at 8. L&I denied the Application, explaining that the proposed multi-family triplex use is prohibited in the District, that the proposed structure to be built did not comply with the District's dimensional requirements for rear yard depth and side yard width, and further that a proposed fence on the Property did not comply with District requirements. *See* Trial Court Opinion at 2-3, R.R. at 241-42; Board Decision at 1, R.R. at 126; *see also* Notice of Refusal, R.R. at 8.[6]

---

[5] We observe that the Application does not appear in either the Reproduced Record or the Certified Record of this matter. However, the Notice of Refusal indicates that the Application requested the following:

> Relocation of lot lines to create one (1) lot (Lot-D), from three (3) deeded lots with four (4) OPA accounts (size and location shown on the plan)[.]

> New construction of a semi-detached building with a roof deck and a roof access structure (size and location as shown on plans/[A]pplication) for use as a multi-family household living (3 units)[.]

Notice of Refusal, R.R. at 8 (all capitals omitted).

[6] The Notice of Refusal expressly included "one (1) use refusal[,] three (3) zoning refusals." Notice of Refusal, R.R. at 8 (all capitals omitted). Thus, L&I refused the use variance and the three requested dimensional variances required by the Application's second request. The consolidation of the lots was not before the Board and, accordingly, is not before us on appeal. Under the Philadelphia Zoning Code, a reverse subdivision, also referred to as a lot consolidation or lot line adjustment, requires approval from the Philadelphia City Planning Commission before L&I can issue any zoning permits related to the adjustment. *See* Philadelphia, Pa. Code § 14-304(6)(b)(.1) (L&I shall not issue any zoning permits for a lot adjustment unless the lot adjustment has been first reviewed and approved by the Commission) (current through 2025).

Applicant timely appealed the Notice of Refusal to the Board, which conducted a hearing on the matter.[7] *See* Trial Court Opinion at 3, R.R. at 242; Board Decision at 2, R.R. at 127; *see also* R.R. at 85-124. At the conclusion of the hearing, the Board unanimously voted to grant the variances requested in the Application. *See* Trial Court Opinion at 4-5, R.R. at 243-44; Board Decision at 2 & 11, R.R. at 127 & 136; *see also* R.R. at 120.

Objectors appealed to the Trial Court,[8] which affirmed the Board Decision by order dated October 4, 2023 (Trial Court Order). *See* Trial Court Order, R.R. at 223-24; Trial Court Opinion at 5, R.R. at 244. Objectors then timely appealed to this Court.

## II. Issues

Objectors raise two arguments on appeal.[9] First, Objectors claim that the Board erred by granting the Application where a witness testified that a single-family home could be built on the Property without variances. *See* Objectors' Br. at 4 & 13-18. Objectors also argue that the Board erred by granting the Application because Applicant put forth no evidence that the variances sought by the Application represented the minimum necessary to alleviate any alleged hardship or that granting the requested variances would not adversely impact the surrounding neighborhood.

[7] Technical difficulties experienced by one of Applicant's witnesses caused the hearing to be conducted over two days: December 7 & 22, 2022. *See* Trial Court Opinion at 3, R.R. at 242; Board Decision at 2 & 6, R.R. at 127 & 131; *see also* R.R. at 85-124.

[8] As this Court has explained, "there is no requirement that an aggrieved party/person have appeared before the [Board] as a prerequisite to the right to appeal." *In re City of Phila.*, 245 A.3d 346, 353 (Pa. Cmwlth. 2020).

[9] Where a trial court has taken no additional evidence, this Court's review is limited to determining whether a zoning board's findings are supported by substantial evidence or whether the zoning board made an error of law in rendering its decision. *See Twp. of Exeter v. Zoning Hearing Bd.*, 962 A.2d 653, 659 (Pa. 2009).

*See* Objectors' Br. at 4 & 18-21. Applicant, in turn, challenges Objectors' standing to pursue their appeal from the Board's decision. We address the standing issue first, and then the question of the minimum variance necessary for relief, which we conclude is dispositive of this appeal.

### III. Discussion

### A. Standing

Applicant challenges the standing of Objectors to pursue their appeal of the Board's decision. We conclude that both Schell and the Association have standing.

Applicant expressly admits that Schell "potentially ha[d] a substantial, direct, and immediate interest due to proximity . . . ." Applicant's Br. at 29. Applicant contends, however, that despite the proximity of her residence to the Property, Schell was required to allege particularized harm to establish standing and, further, that the proposed variances would not result in particularized harm because the proposed project would not produce any increase in density over a permitted use. *Id.* We disagree. This Court has previously explained that "proximity of the properties may be sufficient to establish a perceivable adverse impact" for standing purposes. *Soc'y Created to Reduce Urban Blight v. Zoning Hearing Bd. of Adjustment*, 951 A.2d 398, 404 (Pa. Cmwlth. 2008), *aff'd sub nom. Spahn v. Zoning Bd. of Adjustment*, 977 A.2d 1132 (Pa. 2009); *accord id.* (explaining further that an assertion of a particular harm is needed for standing by an objector without property in the immediate vicinity). Here, Schell lives within 500 feet of the Property. R.R. at 81. We conclude that is sufficient proximity to the Property to confer standing. *See Appeal of Hoover*, 608 A.2d 607, 611 (Pa. Cmwlth. 1992) (concluding that

5

objectors residing within 150-200 yards of a contested use had standing). Based on that proximity, Schell did not need to aver additional particularized harm.

Regarding the Association, organizational standing exists for a group committed to preservation in a specific neighborhood of the City of Philadelphia. *See In re Friends of Marconi Plaza*, 287 A.3d 965, 977 (Pa. Cmwlth. 2022). Applicant does not challenge the Association's status as such a group. Rather, Applicant contends that in order to have standing to appeal, the Association had to have appeared or otherwise objected before the Board. *See generally* Applicant's Br. at 23-29. We discern no merit in this argument. Counsel for Applicant confirmed to the Board that he provided notice to and met with the Association in advance of the Board hearing and that nine members of the Association attended the meeting, eight of whom opposed the Application. R.R. at 87, 89 & 95. The Association also sent the Board a letter of opposition, *see id.* at 90, and Applicant does not point to any provision in the City of Philadelphia's home rule charter or other law that requires any specific form of writing needed to constitute an appearance by an association. *Cf. Newtown Heights Civic Ass'n v. Zoning Hearing Bd.*, 454 A.2d 1199, 1200 (Pa. Cmwlth. 1983) (applying the Pennsylvania Municipalities Planning Code[10] and explaining that "to attain party status, civic or community organizations must enter or make a recognized appearance in some manner, the entry of an appearance in writing on forms provided by the board being one, but not the exclusive, method for securing that recognition"). In addition, one of the attendees from the Association meeting, Michael Lang, testified under oath at the Board hearing. R.R. at 97-99. Lang expressly referenced his attendance at the Association meeting and the opposition of eight of the nine attendees as he

---

[10] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202.

6

challenged the sufficiency of Applicant's showing of entitlement to variance relief. *Id.* For these reasons, we conclude that the Association adequately appeared or objected before the Board.

We also reject Applicant's alternative suggestion that the Association could not bootstrap its way into standing through Schell because she lacked standing and therefore could not confer organizational standing on the Association. Applicant's Br. at 29-30. *See Lincoln Party v. Gen. Assembly*, 682 A.2d 1326, 1330 (Pa. Cmwlth. 1996) (explaining that "[s]tanding may be conferred upon an association solely as the representative of its members" where there is a threatened injury to the interest of at least one member); *Accord Del. Valley Apartment House Owner's Ass'n v. Dep't of Revenue*, 389 A.2d 234, 236 (Pa. Cmwlth. 1978) (holding that an association had standing in a declaratory judgment action, based on the standing of its members). As we concluded above that Schell had standing, we likewise conclude that she thereby conferred organizational standing on the Association.

Because Schell had standing as a party, and because both Schell's party status and Lang's appearance and testimony at the Board hearing conferred standing on the Association to pursue its appeal, we reject Applicant's standing challenge. Accordingly, we address the merits of Objectors' appeal.

**B. Minimum Variance Necessary for Relief**

"An application for a variance seeks permission to do something which is prohibited by [a] zoning ordinance. In essence, a variance constitutes an exception, or an overriding of legislative judgment concerning the will of the citizens of the community regarding land use." *Metal Green Inc. v. City of Phila.*, 266 A.3d 495, 506 (Pa. 2021). As such, "[a] variance is an extraordinary exception and should

7

be granted sparingly[.]" *Heisterkamp v. Zoning Hearing Bd. of City of Lancaster*, 383 A.2d 1311, 1314 (Pa. Cmwlth. 1978). "The burden on an applicant seeking a variance is a heavy one, and the reasons for granting the variance must be substantial, serious and compelling." *Singer v. Phila. Zoning Bd. of Adjustment*, 29 A.3d 144, 149 (Pa. Cmwlth. 2011); *see also Fairview Twp. v. Fairview Twp. Zoning Hearing Bd.*, 233 A.3d 958, 963 (Pa. Cmwlth. 2020) (noting that the burden on the applicant for a use variance is heavy).

Because a use variance involves a "proposal to use the property in a manner that is wholly outside the zoning regulation," our courts have required strict proof to obtain a use variance, without employing the somewhat relaxed standards that have been permitted for establishing the hardship element for dimensional variances. *Hertzberg v. Zoning Bd. of Adjustment*, 721 A.2d 43, 47 (Pa. 1998). Normally, a use variance applicant must prove that there is a unique hardship affecting the property; that granting the requested variance will not result in an adverse effect on the public health, safety, or general welfare; and that ***the requested variance is the minimum variance that will afford relief with the least modification possible***. *See Marshall v. City of Phila.*, 97 A.3d 323, 329 (Pa. 2014); *see also Metal Green*, 266 A.3d at 508. Specifically, the Philadelphia Zoning Code (Zoning Code) requires a variance applicant to establish, *inter alia*, that "[*t*]***he variance, whether use or dimensional, if authorized will represent the minimum variance that will afford relief and will represent the least modification possible of the use or dimensional regulation in issue*** . . . ." Zoning Code Section 14-303(8)(b) (emphasis added).

Objectors argue that the Board erred by granting the Application because, *inter alia*, Applicant put forth no evidence that the variances sought

8

represented the minimum necessary to alleviate any alleged hardship. We agree with Objectors that Applicant is not entitled to variance relief.

At the hearing, Applicant's Counsel presented argument to the Board which, when called to testify, Mr. Masip adopted as his testimony. *See* Board Decision at 6, R.R. at 131; *see also* R.R. at 91. While conceding that the Property's three lots are zoned for single-family dwellings, Applicant's Counsel explained to the Board that all three of the lots had been vacant for the past 30 years. *See* Trial Court Opinion at 3, R.R. at 242; Board Decision at 3, R.R. at 128. Applicant's Counsel explained that Mr. Masip, who lives in the neighborhood in addition to owning the lots, would like to be able to use the Property instead of having the lots continue to lie fallow, and had, to that end, previously and unsuccessfully applied to the Board seeking to build two three-story structures on the Property. *See* Trial Court Opinion at 3-4, R.R. at 242-43; Board Decision at 3-4, R.R. at 128-29. Applicant's Counsel also explained that a previous application seeking to construct two three-story buildings to accommodate four families on the Property had been denied. *See* R.R. at 87-88.

While acknowledging that a single-family home could be built on the Property, Applicant's Counsel asserted that such a by-right home could contain approximately 7,500 square feet, which would be about five to six times bigger than nearby properties, effectively creating a white elephant by dwarfing everything in the neighborhood. *See* R.R. at 101 & 113. Applicant's Counsel explained that the instant Application instead proposed a three-family dwelling with a reduced height to comport with the character of the neighborhood. *See* Trial Court Opinion at 3, R.R. at 242; Board Decision at 3-4, R.R. at 128-29; *see also* R.R. at 101, 113 & 116-19.

Applicant's Counsel also argued that building separate zoning-compliant structures on the three individual Property lots would require multiple dimensional variances and easements per lot, which requirements could be obviated or mitigated by granting the variances sought by the Application. *See* Trial Court Opinion at 3, R.R. at 242; Board Decision at 4-5, R.R. at 129-30. As such, Applicant's Counsel contended that the variances requested by the Application were the minimum necessary to overcome the Property's hardship. *See* Board Decision at 5, R.R. at 130.

Applicant also presented the testimony of Jeremy Avellino, its project architect. *See* Trial Court Opinion at 4, R.R. at 243; Board Decision at 8-11, R.R. at 133-36. Mr. Avellino explained that the consolidation of the three lots would create a 2,012-square-foot lot, which he posited would allow for the construction of a 7,500-square-foot single-family home (presumably having multiple floors). *See* R.R. at 112-13. Mr. Avellino testified that, by building the proposed two separate but connected buildings on the Property, Applicant could avoid building a very large, 7,500 square foot house that would be out of character with the rest of the neighborhood. *See* Trial Court Opinion at 4, R.R. at 243; Board Decision at 9, R.R. at 134; R.R. at 112-13. Mr. Avellino also asserted that each of the three lots to be consolidated into the Property could have a single-family home built on it by right, although the existing lots are individually too small to build single-family homes without dimensional variances to do so. *See* Board Decision at 10, R.R. at 135. Mr. Avellino further stated that, under the Zoning Code, splitting the central lot down the middle and creating two lots would not create lots large enough to build single-family homes on either one without dimensional variances. *See* Board Decision at 10, R.R. at 135.

The City Planning Commission provided the Board with its recommendation through the testimony of David Fecteau. *See* Trial Court Opinion at 4, R.R. at 243; Board Decision at 8, R.R. at 133. Mr. Fecteau agreed with Applicant that the shape of the Property creates a hardship requiring dimensional variances but argued that Applicant had not provided evidence that the size and shape of the Property would prevent the construction of a single-family home. *See* Trial Court Opinion at 4, R.R. at 243; Board Decision at 8, R.R. at 133. Accordingly, Mr. Fecteau explained, the City Planning Commission recommended that the Board grant the requested dimensional variances but deny the requested use variance to place three dwelling units on the Property. *See* Trial Court Opinion at 4, R.R. at 243; Board Decision at 8, R.R. at 133.

Based on the evidence, the Board found that Applicant met the Zoning Code's criteria for the requested variances. *See* Board Decision at 13-15, R.R. at 138-40. Specifically, the Board found:

> 13. The [P]roperty consists of three lots, two of which are landlocked, lacking any street frontage. The landlocked lots are significantly undersized at 311 and 561 square feet, respectively. The one lot with frontage faces Boston Street despite its Tulip Street address and has a width of 36 feet. The homes on Boston Street across from the [P]roperty are two stories in height.
>
> 14. [T]he erection of one single-family home on each lot could not be accomplished without significant variances based on the current condition of the lots. Alternatively, a by-right, single-family home on the consolidated lots would be large and out of character with the rest of the

11

neighborhood which consists of modest attached homes.[11]

15. Likewise, the Board determined that the size and shape of the lots created a hardship necessitating the requested dimensional variances. As previously stated, the Applicant showed that the lots cannot be developed individually in compliance with the [District] dimensional standards due to this hardship. The uniqueness of the lots also prevents the by-right development of two[ ]single family homes if the lot lines were rearranged to create two parcels with frontage on Boston Street. In addition, the Board also noted that the hardship due to the shape and size of the lots was acknowledged by the Planning Commission, the [Association], and Mr. Lang, all of whom were in opposition to at least the multi-family use aspect of the project.

16. Moreover, *the Board found that the requested use and dimensional variances represented the least minimum* [sic] *to afford relief* based on the identified hardships. The Applicant did not requesting [sic] any density beyond what would be permitted if the three lots were developed individually. In addition, the Applicant demonstrated that the requested dimensional variances were less than what would be required to build a single-family house on each lot. The Board also found that the requested side yard variance was de minimus [sic], as only five feet were required and three and one-half feet were proposed.

17. Concerning the effect of the requested variances on the public health, safety, or general welfare, the Board was presented with only general testimony and no evidence regarding the potential negative impact of the proposed

---

[11] We note that Applicant's hypothetical 7,500-square-foot house on a 2,012-square-foot lot (less the mandated setbacks) would require more than the two stories the Board found were common in the neighborhood. We further note that Applicant offered no evidence that a house on the lot would have to cover the lot or contain 7,500 square feet.

project on the community. As explained in the [Association's] letter and Mr. Lang's testimony, the community was apparently opposed to the density of a triplex even though it was commensurate with the development of three single-family homes. The Applicant averred that the neighbors wanted the lot to remain undeveloped. However, that contention was not supported by the [Association's] letter or the testimony of Mr. Lang. Despite this contradiction in the record, the Board was [not] provided with any explanation by the community, via letter, petition, or testimony, as to any adverse impacts the proposed development would have if the requested variances were granted.

18. In contrast, the Applicant demonstrated that [it] had made a concerted effort to develop the project in a way that would have a minimal impact on the neighborhood. For example, the front of the building was only two stories in height to match the other homes on Boston Street. Terraces instead of roof decks were utilized for additional outdoor space that would not invade the privacy of the neighbors. Lastly, two of the three side yards complied with [District] standards (and the one that did not was de minimus [sic]), thereby providing a buffer between the [P]roperty and the adjacent lots.

19. Therefore, the Board concludes that the Applicant has established that the criteria under the Zoning Code were satisfied and that the grant of the requested use and dimensional variances was thus appropriate. The Board finds the Applicant has met [its] burdens of production and persuasion through credible testimony and evidence, which warrants the requested relief.

Board Decision at 13-15, R.R. at 138-40 (emphasis added) (internal record citations and footnote omitted).

On appeal, the Trial Court affirmed, noting that its role was not to substitute its judgment for that of the Board and that it could reverse only where the

Board's findings were without substantial evidence in the record. *See* Trial Court Order at 1 n.1, R.R. at 223. The Trial Court explained that, here,

> [t]he [Board] engaged in extensive fact-finding, and heard from witnesses on both sides of the issues presented. The [Board] concluded that (i) the unique shape, size, and location of the three parcels constituted an unnecessary hardship; (ii) the use and dimensional variances sought are minimal in that [Applicant] is not seeking increased density, and the side yard variance is de minimis[;] and (iii) any "by-right" development – the development proposed by [Objectors] – would itself require large homes that would be out of character with the neighborhood.
>
> In considering the applicable criteria, the [Board] was free to make credibility determinations and weigh the testimony and evidence, which this Court may not disturb on appeal. Based on this Court's review of the record, the [Board] considered the competing evidence and determined that [Applicant] satisfied the requisite criteria. [Objectors'] fact-based arguments regarding alleged error committed by the [Board], which generally amount to disagreement with the [Board's] conclusions based on facts adduced at the hearing, have no merit. This Court concludes that there is substantial evidence in the record supporting the [Board's] conclusion.

Trial Court Order at 1-2 n.1. The Trial Court effectively repeated these determinations and conclusions in its Pennsylvania Rule of Appellate Procedure 1925(a) Opinion, stating:

> Contrary to [Objectors'] argument, the [Board] engaged in extensive fact-finding. The [Board] concluded that (i) the unique shape, size, and location of the three parcels constituted an unnecessary hardship; (ii) the use and dimensional variances sought are minimal in that the

14

Applicant is not seeking increased density; (iii) the side yard variance is *de minimis*[;] (iv) one single-family home on each lot (if not consolidated) could not be accomplished without significant variances based on the current condition of the lots and[] (iv) [sic] any "by-right" development on the consolidated lot – the development proposed by [Objectors] – would itself require large homes that would be out of character with the neighborhood.

In this sense, the [Board] balanced the equities. As the [P]roperty is currently situated, it is unusable. Two of the rear lots are landlocked without street access, and the third lot has street access facing Boston Street. Development of the lots in any form would require a variance. The Objectors proposed large, single-family home(s) that would be out of character with the neighborhood. The [Board] weighed the credibility of the testimony and evidence and concluded that Applicant's triplex proposal ***satisfied the minimal variance criteria for both dimensional and use variances***. Based on this Court's review of the record, (i) the [Board] carefully considered the competing evidence;[;] (ii) the [Board's] conclusion is supported by substantial evidence; and (iii) the [Board] did not commit an error of law.

Trial Court Opinion at 7-8, R.R. at 246-47 (emphasis added).

We do not agree with the Board or the Trial Court's determinations or conclusions that Applicant's evidence satisfied its burden to demonstrate that the requested variances would be the minimum variances required for zoning relief. Applicant's Counsel conceded in his presentation that, once the three smaller lots are consolidated, the consolidated, single Property could be used for a permitted

15

purpose, *i.e.*, a single-family home, without the need for variances.[12] Simply put, the evidence presented by Applicant illustrates that, despite the fact that the consolidated Property can be used for a permitted use, Applicant wants to use the Property for a different use, *i.e.*, a multi-family dwelling, which is not a permitted use in the District. Appellant's preference for that use does not render the requested variances the minimum necessary for relief. Thus, the Board improperly granted a use variance in this matter.

Applicant's Counsel's suggestion that Applicant could conceivably construct on the Property, as a permitted use, a 7,500-square-foot single-family home that would dwarf other homes and be out of character with the rest of the neighborhood is of no moment. The character of the neighborhood is a consideration for *variances* from by-right uses, not for *permitted*, *by-right uses*, which, by definition, do not require variances. *See Hoekstra v. Amity Twp. Zoning Hearing Bd.* (Pa. Cmwlth. No. 723 C.D. 2023, filed March 18, 2025),[13] slip op. at 30 (noting that the alteration of a neighborhood's essential character was a consideration for variances for encroachments into overlay districts but not for a permitted use in the primary zoning district); *accord generally Duffy v. Zoning Hearing Bd. of Upper Chichester Twp.*, 61 A.3d 1069 (Pa. Cmwlth. 2013) (observing that a by-right use did not require compliance with additional approvals, including impact on the neighborhood, that would be applicable to conditional uses). Therefore, provided it complied with the District's setback and other dimensional requirements,

---

[12] We observe that, despite Applicant's repeated suggestion at oral argument, the Zoning Code contains no provision that entitles a property owner to aggregate the density allowances of multiple lots once combined into a single lot, as Applicant requested in this case.

[13] This unreported opinion is cited as persuasive authority under Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

Applicant's Counsel's theoretical, as-of-right 7,500-square-foot single-family home would still be a permitted structure/use within the District despite being arguably out of character with the neighborhood's other homes. Additionally, we observe that even assuming that such a large, single-family structure may be permitted on the Property, nothing would in any way obligate or require Applicant to build a 7,500-square-foot home on a 2,012-square-foot lot.

Regarding the dimensional variances requested in the Application (those beyond the relocation of the lot lines), we observe that these dimensional variances refer to the planned construction of a multi-family dwelling and thus require, as a prerequisite, the grant of the use variance sought by the Application. Therefore, as a result of our determination that Applicant failed to proffer sufficient evidence to permit the Board to grant the requested use variance, we need not examine the requested dimensional variances at this time.

## IV. Conclusion

In light of the foregoing, we conclude that Objectors have standing to pursue their objections. However, we find the Board erred by determining that Applicant satisfied its burden of demonstrating that the requested use variance was the minimum variance required to provide relief. Further, because the dimensional variances requested in the Application require as a prerequisite the grant of the use variance requested therein, the Board also erred by granting the requested dimensional variances. Accordingly, we reverse the Trial Court Order affirming the Board Decision.

                                        _____
                                        CHRISTINE FIZZANO CANNON, Judge

17

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: Appeal of: Alyssa Schell and : 
Olde Richmond Civic Association :
:
From a Decision of: Zoning Board :
of Adjustment :
:
Appeal of: Alyssa Schell and :   No. 1249 C.D. 2023
Olde Richmond Civic Association :

# **O R D E R**

AND NOW, this 19th day of March, 2026, the October 4, 2023 order of the Court of Common Pleas of Philadelphia County is REVERSED.

_____
CHRISTINE FIZZANO CANNON, Judge